1999 ME 14

**STATE of Maine**

v.

**Robert ARDOLINO.**

Supreme Judicial Court of Maine.

Argued Nov. 5, 1998.

Decided Jan. 21, 1999.

Andrew Ketterer, Attorney General, William R. Stokes, Asst. Atty. Gen., (orally), Donald W. Macomber, Asst. Atty. Gen., Augusta, for State.

Peter L. Murray (orally), Portland, for defendant.

Before CLIFFORD, and RUDMAN, DANA, SAUFLEY and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Robert Ardolino appeals from a judgment entered in the Superior Court (Penobscot County, *Kravchuk, C.J.*) denying his motion for a new trial on the ground of newly discovered evidence. Ardolino contends that the court erred because post-trial enhancement of the audio tape recording of an interview the police conducted with Ardolino reveals that the transcript of the recording presented to the jury at trial was inaccurate and allowed the State to unfairly characterize what was on the recording in its closing argument. Because Ardolino had possession of a copy of the original recording 18 months prior to trial, the Superior Court determined that the enhanced recording did not constitute newly discovered evidence within the meaning of M.R.Crim. P. 33. We affirm its judgment.

[¶ 2] In 1996, Ardolino was convicted of depraved indifference murder of his nine year old son, Matthew. *See State v. Ardolino,* 1997 ME 141, 697 A.2d 73. Matthew, who lived with his brother Daniel in Ardolino's home,[1] died on June 27, 1993, from acute peritonitis, a massive abdominal infection resulting from a delayed rupture of his intestine approximately 24 hours prior to his death. The rupture was caused by trauma to his abdomen. Ardolino's conviction resulted in substantial part from evidence indicating that he failed to obtain medical attention for Matthew after the severity of his illness became apparent.

[¶ 3] In March of 1998, Ardolino, relying on the recording of an audio tape digitally enhanced subsequent to his trial, filed a motion for a new trial based on newly discovered evidence. On the tape was an audio recording of an interview of Ardolino conducted by Detective Robert Cameron, of the Maine State Police, at the Maine Coast Memorial Hospital, where Matthew was taken on the morning of June 27. A recording and transcript of the interview were provided to Ardolino's counsel soon after Ardolino was indicted in August of 1994.

[¶ 4] At trial, Detective Cameron testified about the interview between himself and Ardolino and identified the audio recording. The State sought to play the audio recording in the presence of the jury, and to use a transcript of the recording as an aid to the jury because, as the State contended, the quality of the recording was poor, and portions of it were difficult to hear. Ardolino

---

1. The boys' mother, Ardolino's wife, had left the home after her separation from Ardolino.

had no objection to playing the tape, but objected to the introduction of the transcript. Counsel for Ardolino argued that the recording on the tape was clear and a transcript was unnecessary, and that allowing the jury to both hear and read the interview unfairly emphasized the interview. He urged that only the recording should be admitted in evidence. The court did allow the transcript to be used, as an aid to the jury when the audio recording was played, but did not admit the transcript in evidence.

[¶ 5] In contending that Ardolino was guilty of depraved indifference murder,[2] the State relied substantially on Ardolino's failure to seek medical attention for Matthew after it became obvious that Matthew was seriously injured or ill. Matthew's bedroom was on the second floor of Ardolino's home. In the early morning hours on the day of Matthew's death, however, Matthew was found by Daniel on the living room sofa, on the first floor. Ardolino had awakened Daniel and asked him to check on Matthew. The State contended that how Matthew, who went to his bed on the second floor, was found by Daniel on the living room sofa on the first floor, implicated Ardolino in the depraved indifference murder. The State argued that Daniel was too small to move Matthew down the stairs without help, and medical testimony demonstrated that, in his condition, it was highly unlikely that Matthew would have been able to move himself.

[¶ 6] Ardolino contended that he had not seen Matthew from the time Matthew went to bed until Daniel found his body on the sofa. The State theorized, however, that Ardolino was up earlier, observed Matthew's serious condition, and carried him downstairs. Knowing that Matthew was dying, Ardolino did nothing to save him, but rather concealed his knowledge of Matthew's condition by later asking Daniel to check on his brother. In the State's closing argument, the prosecution stated:

[t]hat the Defendant was up earlier than 4 o'clock and knew Matthew was dead is supported by the Defendant's own words and actions. In his statement to Detective Cameron, which is again on tape, he mentioned to Detective Cameron that [Matthew's] bed had vomit on it. Remember that? How would he know? How would he know unless he had gone upstairs? *According to him, he didn't. He sent Danny.* He woke Danny up and told him to check on his brother. *In order for him to know that there was vomit on Matthew bed, he had to have been up there earlier in the night before he woke Danny up.*

(emphasis added). Ardolino argues that the enhancement of the recording on the tape shows that Ardolino made specific statements that were altered or excluded from the transcript and that those statements refute the State's theory.

[¶ 7] The enhanced version of the tape recording reveals a number of discrepancies between it and the transcript of the recording on the unenhanced version of the tape used at the trial. The majority of discrepancies, however, are of little consequence. Ardolino contends that part of the enhanced recording shows he stated to Detective Cameron that he went upstairs prior to leaving the house to accompany Matthew to the hospital.

I know, I was getting ready to leave the house, went upstairs, and there was ah– vomit in–in his bed. There was vomit in his bed, ah a coupla' little spot (ui) .... We went up to shut the light off together. Daniel went up to shut his lights, cause you could see his (ui) .... So he went to sleep upstairs, and we ended up findin' him on the couch.

The transcript used at trial, however, did not reflect any statement by Ardolino that he had gone upstairs prior to leaving for the hospital.[3] Ardolino contends that the statements on the enhanced recording refute the

2. 17–A M.R.S.A. § 201(1)(B) (1983) provides:
   I. A person is guilty of murder if:
   ....
   B. He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being[.]

3. The transcript stated "I don't know. I don't know what he had on ... there was vomit in his bed, there was vomit in his bed, and like a couple of little spots, another spot, went up and shut the light off."

State's theory that he must have seen Matthew before 4 o'clock in the morning in order to have known there was vomit on Matthew's bed. He argues that because that evidence was so crucial to his conviction of depraved indifference murder, he is entitled to a new trial.

[¶ 8] A motion for a new trial based on newly discovered evidence is made pursuant to M.R.Crim. P. 33.[4] To obtain such relief, a defendant must establish by clear and convincing evidence that:

(1) the evidence is such as will probably change the result if a new trial is granted;

(2) it has been discovered since the trial;

(3) it could not have been discovered before the trial by the exercise of due diligence;

(4) it is material to the issue; and

(5) it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

*State v. Dechaine,* 630 A.2d 234, 236 (Me. 1993). "In the interests of fostering an end to litigation and preserving the integrity of criminal judgments, motions for a new trial on the ground of newly discovered evidence are regarded with disfavor." *State v. Preston,* 521 A.2d 305, 308 (Me.1987).

[¶ 9] Accepting the accuracy of the enhanced recording on the tape for purposes of the motion for a new trial, the Superior Court concluded that the enhanced recording did not constitute evidence that was newly discovered within the meaning of Rule 33. A trial court's denial of such a motion is reviewed for clear error. *See State v. Priest,* 617 A.2d 537, 539 (Me.1992). When evidence is known to the defendant at the time of trial, but its significance is not fully appreciated until after the trial, it is "not in the legal sense newly discovered" after the trial. *State v. Lund,* 266 A.2d 869, 877 (Me.1970). Here, the State provided Ardolino with a copy of the original tape recording 18 months

prior to trial. If the original recording was unclear, or Ardolino could not determine whether the transcript accurately reflected the contents of the recording, the recording could have been enhanced prior to the trial. Moreover, Ardolino was in the best position to determine the accuracy of the recording and the transcript, and, in particular, whether the State's closing argument alleged facts inconsistent with his statement to Detective Cameron, or with the events on the day his son died. Ardolino, however, made no objection to the accuracy of the recording on the tape or the transcript, or to any aspect of the State's closing argument. Accordingly, the enhanced version is not newly discovered because "it could have been discovered before the trial by the exercise of due diligence." *Dechaine,* 630 A.2d at 236.

[¶ 10] In contending that a refusal to grant a new trial is unjust because his conviction is based on false information, Ardolino overstates the importance of the transcript in the overall context of the trial. This case does not present a situation in which on a tape recording a defendant sounds like he is confessing to a crime, and the subsequently enhanced version of the recording reflects not a confession, but the defendant's denial of criminal conduct. The State referenced what Ardolino contends are inaccuracies in the transcript in only a few sentences in the closing argument. There is no indication that the jury convicted Ardolino based on the transcript, and the reference in the State's closing argument to the source of Ardolino's knowledge that there was vomit on Matthew's bed was but a small part of the evidence relied on by the State to convince the jury of Ardolino's guilt. There was substantial evidence pointing to Ardolino's physical and emotional abuse of the boy, of Ardolino's awareness of Matthew's serious condition (his body had more than one hundred bruises and abrasions), and that his son was vomiting bile on the day prior to his death. Despite that awareness, Ardolino did not seek medical attention for Matthew.

---

4. Rule 33 provides that:
[t]he court on motion of the defendant may grant a new trial to the defendant if required in the interest of justice.... Any motion for a

new trial based on the ground of newly discovered evidence may be made only before, or within 2 years after, entry of the judgment in the criminal docket.

[¶ 11] Ardolino had possession of the original tape recording 18 months prior to trial. He repeatedly vouched for its accuracy and failed to object to any inaccuracy between what was on the tape played at the trial, or the transcript used at the trial, and what he actually said during the interview, or the events that took place on the day of his son's death. Moreover, the impact that the availability of the enhanced version of the recording would have had on the outcome of Ardolino's trial is minimal, at best. The Superior Court did not err in concluding that the enhanced version of the audio tape recording did not constitute newly discovered evidence, and correctly denied the motion for a new trial.

The entry is:

Judgment affirmed.

